IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BENJAMIN M. ANDREWS,
*Administrator of the estate of Zachary Tuggle,*

    **Plaintiff,**

v.                                                                                                               **Civil Action No. 3:17cv167**

SHERIFF C.T. WOODY, *et al.,*

    **Defendants.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendants Naphcare, Inc., Demetrice Smith, Tracy Turner, Gwen Drake, Cecelia Faison, and Khairul Emran's (collectively, "Defendants") Motion for Summary Judgment,[1] filed pursuant to Federal Rule of Civil Procedure 56.[2] (ECF

---

[1] The day after filing their Motion for Summary Judgment, Defendants filed a Motion to Consider Timely Filed Motion for Summary Judgment (the "Motion to Consider Timely"). (ECF No. 77.) The Court already had granted several motions for extensions of time to file briefing. (*See, e.g.,* ECF No. 62 (granting Defendants' motion to extend deadline for submitting dispositive motions after the dispositive motions deadline had already passed and *sua sponte* continuing the trial date because of the proposed extension); ECF No. 66 (granting a joint motion to *again* extend deadlines for parties to submit dispositive motions).) Defendants stated in the Motion to Consider Timely that, although the Court had ordered the parties to file any dispositive motions by close of business April 9, 2018, Defendants experienced computer problems, resulting in Defendants filing their Motion for Summary Judgment at 5:29 p.m. on April 9, 2018. Defendants ask that the Court accept their Motion for Summary Judgment as timely filed.

    Pursuant to Federal Rule of Civil Procedure 6(b)(1)(B), the Court may extend time to file "on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). Courts generally consider "the danger of prejudice to the [non-movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Tobey v. Keiter, Stephens, Hurst, Gary & Shreaves,* No. 3:13cv315, 2014 WL 61325, at *4 (E.D. Va. Jan. 7, 2014) (alteration in original) (quoting *Thompson v. E.I. DuPont de Nemours & Co.,* 76 F.3d 530, 533 (4th Cir. 1996)). Finding that excusable neglect exists for Defendants' failure to timely file their Motion for Summary Judgment, the Court will grant the Motion to Consider Timely.

No. 75.) Plaintiff Benjamin M. Andrews, Administrator of the Estate of Zachary Tuggle ("Andrews") responded, (ECF No. 81), and Defendants replied, (ECF No. 89). The Court heard oral argument on May 30, 2018. Accordingly, the matter is ripe for disposition. The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331[3] and § 1367.[4] For the reasons that follow, the Court will deny the Motion for Summary Judgment.

## I. Factual and Procedural Background

### A. Procedural History

The action before the Court arises from Zachary Tuggle's incarceration at the Richmond City Justice Center ("RCJC") awaiting trial. Tuggle, who had a diagnosed seizure disorder at the time he entered the RCJC, experienced a fatal seizure while incarcerated there. Andrews thereafter filed a Complaint against various defendants alleging, on behalf of Tuggle's estate,

---

[2] Federal Rule of Civil Procedure 56(a) provides, in pertinent part:

> (a) **Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

[3] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Amended Complaint alleges Fourteenth Amendment violations pursuant to 42 U.S.C. § 1983 and brings pendent claims of medical negligence against Defendants.

[4] The Court exercises supplemental jurisdiction over Andrews's negligence claim pursuant to 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ."). The Amended Complaint alleges pendent claims of medical negligence against Defendants.

violations of the Fourteenth Amendment,[5] state law gross negligence, and medical negligence. After Defendant Sheriff C.T. Woody filed a Motion to Dismiss, Andrews filed his Amended Complaint. The Court held an Initial Pretrial Conference and scheduled a jury trial to begin on May 9, 2018.

On March 5, 2018, upon motion by the parties, the Court dismissed Sheriff C.T. Woody and Charles Armstrong as defendants from this action. Only Defendants remain. After granting several joint motions for extensions of time, which ultimately impacted the scheduled trial date, the Court continued the jury trial and set a hearing date and a briefing schedule for dispositive and evidentiary motions.

The following causes of action, articulated in the Amended Complaint, remain:

**COUNT IV:** Medical Negligence Claim against Demetrice Smith, Tracy Turner, Gwen Drake, Cecelia Faison, and Khairul Emran;

**COUNT V:** Vicarious Liability Claim against Naphcare, Inc., based on the negligence of Demetrice Smith, Tracy Turner, Gwen Drake, Cecelia Faison, and Khairul Emran; and,

**COUNT VI:** Section 1983 Claim against Demetrice Smith, Tracy Turner, Gwen Drake, Cecelia Faison, and Khairul Emran for Deliberate Indifference to Tuggle's Serious Medical Needs.

Defendants move for, and Andrews opposes, summary judgment on all counts.

---

[5] The Fourteenth Amendment to the United States Constitution provides, in relevant part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

3

B.  **Factual History**[6]

The claims remaining before the Court—and those which are the subject of the Motion for Summary Judgment—all pertain to the manner in which Demetrice Smith, Tracy Turner, Gwen Drake, Cecelia Faison, and Khairul Emran responded to Tuggle's seizure. Naphcare, Inc. ("Naphcare") provided medical care to Tuggle at RCJC during his incarceration there. Naphcare employed Smith, Turner, Drake, Faison, and Emran (collectively, the "Medical Personnel Defendants") at all times relevant to Andrews's claims.

1.  **Zachary Tuggle's Entry to the Richmond City Justice Center**[7]

On October 31, 2014, Tuggle was arrested and eventually housed in the RCJC awaiting trial. When he entered the RCJC, Tuggle had a diagnosed seizure disorder, resulting from a 2007 gunshot wound to the head. The RCJC medical staff knew that Tuggle had a seizure disorder. Tuggle took Keppra for his seizures, but occasionally still experienced seizures. While housed at the RCJC, Tuggle "was not taking his medicine regularly," and had missed approximately fourteen doses in the thirty days before his death. (Death Summary 2, ECF No. 81-12.)

---

[6] In recounting the factual history, the Court states the undisputed facts as set forth in the parties' briefing on the Motion for Summary Judgment and the record submitted to the Court. In ruling on the Motion for Summary Judgment, the Court will view the undisputed facts and all reasonable inferences therefrom in the light most favorable to Andrews, the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). At this stage, however, the Court merely states the undisputed facts.

[7] In their briefing on the Motion for Summary Judgment, both parties omit background information and focus their factual discussion on the facts most relevant to Andrews's claims. For clarity, the Court briefly recounts the events leading to Tuggle's fatal seizure, relying, when necessary, on allegations in Tuggle's Amended Complaint. The Court relies on the Amended Complaint only for background facts not material to the Motion for Summary Judgment.

4

## 2. Tuggle's July 13, 2015 Seizure

On July 13, 2015, while in his cell, Tuggle experienced a seizure. At approximately 12:28 p.m., a Medical 10-18[8] was called in the RCJC for cell 6F, Tuggle's cell. 911 was also called at approximately that time.

Cecilia Faison, a registered nurse, was the charge nurse at the time the Medical 10-18 was called. She and Demetrice Smith, a licensed practical nurse, retrieved the code cart—a cart medical personnel are supposed to take to every medical emergency—and responded together. Faison and Smith were the first medical personnel to arrive at Tuggle's cell.

When they arrived at Tuggle's cell, Faison saw Tuggle lying on his bed. Smith testified that Tuggle was lying on his side. Faison saw Tuggle take two breaths. Faison checked for, but did not feel, a pulse. Faison and Smith asked the deputy to put Tuggle in the hallway so they could begin CPR.[9] Once in the hallway, Faison and Smith turned Tuggle on his side, and Smith "swip[ed] his mouth and took out some of the vomit," and they began CPR. (Smith Dep. 82, ECF No. 76-3.) Smith testified that when she performed this "finger sweep," a "brown, thick substance" came out of Tuggle's mouth. (*Id.* at 84–85.)

Tracy Turner, a licensed practical nurse, and Gwendolyn Drake, a certified nursing assistant, responded together to the medical emergency call. Turner testified that she retrieved

---

[8] A Medical 10-18 is the code called in the RCJC for a medical emergency.

[9] Smith recalls Faison "assessing him, you know, calling his name, trying to see was he alert, shaking him and stuff" before the deputy pulled Tuggle out of his cell so they could begin CPR. (Smith Dep. 82–83.) Faison did not testify that she called out to or touched Tuggle before beginning CPR.

5

the crash cart before going to Tuggle's cell, 6F.[10] When Turner and Drake arrived at Tuggle's cell, Smith and Faison were already there, and Smith was performing CPR. Smith asked for relief, so Drake did one set of chest compressions on Tuggle, then Smith took back over. Drake felt a "faint pulse" when she checked Tuggle's wrist and neck, and noticed that he was breathing "[a] little." (Drake Dep. 48–49, ECF No. 81-1.) Drake testified that she did not see any blood when doing chest compressions on Tuggle. She also stated that Tuggle had "a little food in his mouth" that other members of the medical response team swept out of his mouth. (*Id.* at 49.)

Dr. Khairul Emran also responded to the Medical 10-18, and arrived to Tuggle's cell at approximately 12:30 p.m. He "checked [Tuggle] for [a] pulse but could not find it." (Death Summary 2, ECF No. 81-12.) In a "Death Summary" prepared by Dr. Emran on July 15, 2015, two days after Tuggle's death, he notes that while performing CPR on Tuggle, "the CPR nurses saw blood coming out of his mouth and nose." (*Id.*)

At 12:30 p.m., the Richmond Ambulance Authority received a call to respond to the RCJC for "Cardiac Arrest." (Patient Care Rep. 1, ECF No. 81-8.) Four minutes later, at 12:34 p.m., Paramedic Samantha Bako, EMT Eric Meyer, and members of the Richmond Fire Department arrived at Tuggle's cell. Smith was administering CPR when Bako and Meyer arrived. Bako testified that, when she and Meyer arrived at Tuggle's cell, she observed the medical personnel "backing away, they didn't want to give information, and nobody—no one even said they didn't know what happened at that time, they just backed away." (Bako Dep. 68,

---

[10] The record does not establish whether multiple crash carts existed, or whether this represents an inconsistency between Turner's and Faison's testimony. Knowing which defendant brought the crash cart to Tuggle's cell, however, is not material to the Motion for Summary Judgment.

6

ECF No. 81-9.) In the Patient Care Report that Bako filled out after responding to the emergency call, she wrote:

> When EMS arrived on scene and asked what was going on[,] staff at the jail didn't answer EMS[. I]t took several attempts and for the fire fighters to say[,] "[H]ey can someone tell us what's going on" before staff at the jail acknowledged EMS.
>
> . . . .
>
> Staff wouldn[']t give EMS report as to events leading up to cardiac arrest. Staff backed away from the [patient] and then asked if they should continue CPR.

(Patient Care Rep. 6.)

The Richmond Fire Department performed CPR while Meyer administered oxygen via mask. Meyer assisted Bako in treating Tuggle, handing her items as she requested them. Meyer was positioned in the jail cell, either standing or kneeling close to Tuggle, but in a position where he "probably wouldn't have access to [Tuggle's] head." (Meyer Dep. at 30, ECF No. 81-6.) Meyer testified that "it was just a normal cardiac arrest scene . . . other than it being just messier than normal" and "all the blood." (*Id.* at 16.)

After performing CPR, Bako attempted to intubate Tuggle, but was unable to do so because he "had copious amounts of blood and vomit in [his] airway." (Patient Care Rep. 4.) Bako wrote that Tuggle "was suctioned, but it still didn[']t help. [Tuggle's] airway willed [sic] back up too fast." (*Id.*) Bako then inserted a "King airway . . . due to the difficult airway." (*Id.* at 6.) Bako wrote that the King airway was successfully inserted, but Tuggle still "had blood and vomit coming out of his nose and mouth around the [K]ing airway even with the suctioning." (*Id.*) Meyer testified to remembering that. Bako administered several medications, but Tuggle remained in serious cardiac arrest. At 1:10 p.m., Bako called the attending doctor and got orders to cease resuscitation efforts. Tuggle was pronounced dead at 1:11 p.m.

7

Bako wrote in the report that "EMS . . . found 4 ammonia packets up [Tuggle's] nose when they first arrived on the scene." (*Id.*) She later testified that she personally found the packets, and removed them from Tuggle's nose. She said that she "vaguely recall[ed] two in each side," and that she has never before responded to a call for assistance during which she removed ammonia packets from a patient's nose. (Bako Dep. 41, ECF No. 81-9.)

### 3. The Ammonia Packets

At the time Tuggle was at the RCJC, Naphcare kept ammonia packets on the code cart. Only medical personnel have access to the ammonia packets; neither inmates nor deputies are allowed to have or use them. Nothing in the record suggests that any inmate or guard possessed or used an ammonia packet during the time that Tuggle was at the RCJC. (*See, e.g.*, Faison Dep. 28, ECF No. 81-2 (testifying that she never saw any inmate or guard in possession of an ammonia packet).)

Faison testified that the medical personnel would use ammonia packets to help determine if someone is faking a seizure: "the ammonia smell is so strong and you know when someone is faking it, when they smell it, they will jerk, if they are not seizing. If you are actively seizing, you won't smell it." (*Id.* at 24, ECF No. 76-2.) Drake, however, testified that she was trained to use ammonia packets if someone had fainted or passed out. In that situation, Drake had been trained to squeeze the ammonia packet and hold it near an individual's nose until the person "come[s] around." (Drake Dep. 14, ECF No. 76-1.) She stated that she was not trained to use ammonia packets to determine if someone were pretending to be passed out. Smith testified that she was trained to use ammonia packets in the same way as Drake: "[t]o arouse a patient." (Smith Dep. 41.) Smith also stated that she did not use ammonia packets to determine whether a seizure was genuine: "Ammonia is to arouse them. No, not for seizures." (*Id.*) Drake and

8

Smith had used ammonia in treating Tuggle on one previous occasion.[11] Turner also testified that ammonia is for use when someone is fainting. She stated that she would "definitely" not use an ammonia packet if she thought someone were faking. (Turner Dep. 16, ECF No. 76-4.)

Faison stated that it would not be appropriate to put ammonia packets in the nostrils of someone having a seizure. Drake testified that there would be no reason to use more than one ammonia packet. Turner affirmed that she would never put an ammonia packet in a patient's nose. Dr. Emran testified that he would not approve of medical staff putting four ammonia packets in a patient's nose during a seizure.

Despite Bako's testimony and documentation of finding four ammonia packets in Tuggle's nose, Turner testified that she did not use or see ammonia packets at any time when responding to the Medical 10-18 on July 13, 2015. Turner also testified that she never looked inside Tuggle's nostrils. Dr. Emran similarly testified that he did not put ammonia packets in Tuggle's nose during the seizure and did not observe anyone put ammonia packets in Tuggle's nose during the seizure. Meyer also testified that he did not recall seeing any ammonia packets in Tuggle's nose. Smith testified that it "is not true at all" that four ammonia packets were in Tuggle's nose. (Smith Dep. 91.) She stated that she "would have seen if somebody put ammonia packets up his nose [because she] was right over his body" when she was performing CPR on Tuggle. (*Id.*)

### 4. The Suction Machine

Dr. Emran expects that a suction machine, which is "vital," would be on the code cart so that it would be available to medical personnel when they respond to a medical code in the jail.

---

[11] On November 12, 2014, a Medical Emergency Code Report states that a Medical 10-18 was called for Tuggle's "seizure[-]like activity." (Code Rep. 1, ECF No. 81-11.) Medical personnel, including Smith and Drake responded. (Id.) The report states that "[r]esident experienced . . . seizure, ammonia utilized to arouse." (Id. at 2.)

9

(Emran Dep. 35, ECF No. 81-13.) Dr. Emran "did not see . . . anybody suctioning [Tuggle] actively" during the Medical 10-18. (*Id.*) Faison also testified that a suction machine is supposed to be kept on the code cart. Smith could not remember if, at the time of Tuggle's death, the code cart should have contained a suction machine.

No testimony exists in the record that anyone saw any of the Medical Personnel Defendants utilizing a suction machine during their response to the Medical 10-18. Neither Faison, Smith, Turner, or Dr. Emran know if the code cart or carts used in responding to Tuggle's July 13, 2015 seizure contained a suction machine.[12]

## II. Analysis: The Motion for Summary Judgment

### A. Standard of Review: Summary Judgment

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson*, 477 U.S. at 248–50. "A fact is material when proof of its existence or nonexistence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return a verdict in favor of the nonmoving party on the basis of such [an] issue." *Brown v. Mitchell*, 327 F. Supp. 2d 615, 628 (E.D. Va. 2004) (*Mitchell II*) (citing *Anderson*, 477 U.S. at 248).

Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues for trial. *Celotex Corp.*, 477 U.S. at 322–24.

---

[12] While not material to the Court's finding, in the Death Summary that Dr. Emran wrote four days after Tuggle's death, he recommended as a "[m]odification[] in [p]rotocol" as a result of his review of Tuggle's death, that "[m]edical should carry portable suction machine to code blue." (Death Summary 3.)

10

These facts must be set forth by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that would be admissible in evidence. Fed. R. Civ. P. 56(c)(1)(A). The party who bears the burden of proof on an issue at trial "cannot survive summary judgment without sufficient evidence to sustain his [or her] burden of proof on that point." *Mitchell II*, 327 F. Supp. 2d at 628 (citing *Celotex Corp.*, 477 U.S. at 327).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of his [or her] evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). In sum, "[t]he nonmoving party is entitled to have its version of all that is disputed accepted, to have all reasonable inferences construed in its favor, to have all factual conflicts resolved in its favor, and to have the benefit of all favorable legal theories invoked by the evidence." *Mitchell II*, 327 F. Supp. 2d at 628 (citing *Kohl's Dept. Stores, Inc. v. Target Stores, Inc.*, 290 F. Supp. 2d 674, 678 (E.D. Va. 2003)).

The ultimate inquiry in examining a motion for summary judgment is whether there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

B. **The Court Will Deny the Motion for Summary Judgment**

   1. **Andrews Presents Evidence that the Medical Personnel Defendants Violated Tuggle's Constitutional Rights (Count VI)**

Andrews brings his Fourteenth Amendment claim[13] in Count VI under 42 U.S.C. § 1983, which provides a private right of action for a violation of constitutional rights by persons acting under the color of state law. "Section 1983 . . . 'is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.' . . . Hence, to establish liability under Section 1983, a plaintiff must show that the defendant, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Brown v. Mitchell*, 308 F. Supp. 2d 682, 692 (E.D. Va. 2004) ("*Mitchell I*") (citations omitted).

   a. **Legal Standard: Fourteenth Amendment Violation**

The Due Process Clause of the Fourteenth Amendment "mandates the provision of medical care to detainees who require it." *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (citation omitted); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998). Thus, when evaluating the constitutionality of a pretrial detainee's claim, the Court must determine whether the government acted in a deliberately indifferent manner to the detainee's serious medical needs. *Harris*, 240 F.3d at 388.

---

[13] Defendants characterize Andrews's § 1983 claims as seeking redress under the Eighth Amendment. However, because Tuggle was a pretrial detainee, his § 1983 claims arise under the Fourteenth Amendment. *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("[I]f Brown was a pretrial *detainee* rather than a convicted prisoner, then the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, 'mandates the provision of medical care to detainees who require it.'" (quoting *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992)). Regardless, "the standard in either case is the same—that is, whether a government official has been 'deliberately indifferent to any . . . serious medical needs.'" *Id.* (quoting *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990)).

12

To establish that the Medical Personnel Defendants violated Tuggle's Fourteenth Amendment rights, Andrews must present triable issues of fact as to two elements. First, Andrews must show that, objectively, the alleged deprivation is sufficiently serious so as to violate the Fourteenth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). A plaintiff satisfies this element by demonstrating that he or she suffered from a serious medical need at the times he or she interacted with the defendant. A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 389, 846 (7th Cir. 1999)).

Second, Andrews must establish that the Medical Personnel Defendants acted with "deliberate indifference" to the right. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Deliberate indifference requires both that a defendant "subjectively recognized a substantial risk of harm" and "that his [or her] actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (internal citation omitted). A mere "error of judgment or 'inadvertent failure to provide adequate medical care,' . . . [does] not constitute a constitutional deprivation redressable under § 1983." *Boyce v. Alizaduh*, 595 F.2d 948, 953 (4th Cir. 1979) (citations omitted), *abrogated on other grounds by Neitzke v. Williams*, 490 U.S. 319 (1989). In other words, deliberate indifference is a higher standard than negligence. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.").[14] The United States Court of Appeals for the Fourth Circuit has

---

[14] "A prison official shows deliberate indifference if he [or she] knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk,

held that "'[f]ailure to provide the level of care that a treating physician himself [or herself] believes is necessary' may constitute deliberate indifference." *Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014) (quoting *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *abrogated on other grounds by Farmer*, 511 U.S. 825 (1994)).

### b. Andrews Creates a Triable Issue of Fact Regarding the Medical Personnel Defendants' Deliberate Indifference to Tuggle's Serious Medical Needs

No party disputes that Tuggle suffered from a seizure disorder, which constitutes a serious medical need.[15] *See, e.g., Heyer v. U.S.B.P.*, 849 F.3d 202, 210 (4th Cir. 2017) ("[W]e have little difficulty concluding that seizures are sufficiently serious to require medical treatment."). Tuggle's seizure disorder manifestly constitutes a medical condition that had been "diagnosed by a physician as mandating treatment," and also amounts to a medical condition "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241. The same would be true for a cardiac arrest. Thus, whether the Medical Personnel Defendants violated Tuggle's Fourteenth Amendment rights turns on whether they failed to act in the face of a *subjectively-known* risk.

As to a subjectively-known risk, Andrews proffers direct evidence via a non-party medical provider that four ammonia packets were in Tuggle's nose at the time of his death. He presents evidence that only the medical staff at the RCJC had access to ammonia packets, and identifies a *lack* of evidence that anyone other than RCJC medical staff ever possessed ammonia packets. He shows that each of the Medical Personnel Defendants arrived at the scene of

---

even if the harm ultimately was not averted. A prison official's duty under the [Fourteenth] Amendment is to ensure reasonable safety." *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003) (internal citations omitted).

[15] Although Defendants fail to explicitly concede the matter, they appropriately do not argue that Tuggle's seizure disorder does not constitute a serious medical need.

14

Tuggle's seizure within minutes—and more likely seconds—of each other. He produces evidence that the RCJC medical staff used ammonia packets to arouse patients who were fainting or to determine whether patients were malingering. Faison testified explicitly that ammonia packets were used to determine if someone was faking a seizure. Furthermore, Andrews identifies a previous situation in which RCJC medical staff and two of the Medical Personnel Defendants had used at least one ammonia packet in responding to a Medical 10-18 for one of Tuggle's seizures. Finally, Andrews presents testimony from each of the Medical Personnel Defendants that ammonia packets should not be placed in a patient's nose.

Drawing all reasonable inferences in Andrews's favor and resolving all factual disputes in his favor,[16] this evidence amply suffices to allow a jury to determine whether any of the Medical Personnel Defendants either placed four ammonia packets in Tuggle's nose, or saw another of the Medical Personnel Defendants place the ammonia packets in Tuggle's nose and did nothing about it. And, if a jury found that any of the Medical Personnel Defendants had done so, it could return a verdict for Andrews on his Fourteenth Amendment claim of deliberate indifference to Tuggle's serious medical needs. *See, e.g., Farmer*, 511 U.S. at 837 (holding that

---

[16] Defendants argue that "there is only one, uncorroborated mention of ammonia packets in any record in this case." (Mem. Supp. Mot. Summ. J. 7.) Of course, at the summary judgment stage, the Court resolves all factual disputes in Andrews's favor, and Andrews is "entitled to have [his] version of all that is disputed accepted, to have all reasonable inferences construed in [his] favor, [and] to have all factual conflicts resolved in [his] favor." *Mitchell II*, 327 F. Supp. 2d at 628 (citing *Kohl's*, 290 F. Supp. 2d at 678). Therefore, to the extent a factual dispute exists about whether ammonia packets were in fact in Tuggle's nose at the time of his death, the Court resolves that dispute in favor of Andrews and assumes that the ammonia packets were in Tuggle's nose.

Also, to be clear, the record before the Court contains *two* indices that ammonia packets were in Tuggle's nose at the time of his death. The non-party emergency medical responder, Bako, made a contemporaneous medical record noting that "EMS also found 4 ammonia packets up [Tuggle's] nose when they first arrived on scene." (Patient Care Rep. 6.) She later confirmed in her deposition testimony that she personally found them.

deliberate indifference exists when an "official knows of and disregards an excessive risk to inmate health or safety").

The Court will deny the Defendants' Motion for Summary Judgment as to Count VI.

### 2. Andrews Presents Evidence that the Medical Personnel Defendants Were Negligent in Their Treatment of Tuggle (Counts IV and V)

For the same reasons that Andrews survives summary judgment on the question of deliberate indifference, Andrews presents evidence sufficient to create a genuine dispute of material fact regarding whether the Medical Personnel Defendants were negligent in their treatment of Tuggle's medical needs.[17] Deliberate indifference is "a higher standard for culpability than mere negligence or even civil recklessness." *Jackson*, 775 F.3d at 178. The evidence Andrews presents that could lead a reasonable jury to conclude that the Medical Personnel Defendants were deliberately indifferent to Tuggle's serious medical need could

---

[17] Defendants place the entirety of their argument in support of summary judgment on Counts IV and V in the following two-sentence paragraph at the end of their Memorandum in Support of their Motion for Summary Judgment:

> For the same reasons advanced above for any claims against any Defendant, including NaphCare, Inc.[,] on vicarious liability grounds, on the use of ammonia packets, the Defendants respectfully request that Counts IV and V be dismissed and Summary Judgment granted on the basis of a lack of an evidentiary foundation. *There is simply no evidence from which to conclude that the named Defendants placed ammonia packets in Mr. Tuggle's nose*, and therefore, claims against them regarding this allegation must be dismissed.

(Mem. Supp. Mot. Summ. J. 10–11 (emphasis added).) Of course, as discussed, there *is* evidence from which a reasonable jury could conclude that the Medical Personnel Defendants placed ammonia packets in Tuggle's nose. Defendants' half-hearted attempts to argue otherwise do not convince.

therefore easily allow a reasonable jury to conclude that the Medical Personnel Defendants were negligent in their response to Tuggle's seizure.[18]

The Court will deny the Motion for Summary Judgment as to Counts IV and V.

### III. Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion to Consider Timely, (ECF No. 77), and deny Defendants' Motion for Summary Judgment, (ECF No. 75). An appropriate Order will issue.

It is SO ORDERED.

/s/ 
M. Hannah Lauck
United States District Judge

Date: 5/31/2018
Richmond, Virginia

---

[18] Defendants present no argument that Naphcare cannot be held liable for the Medical Personnel Defendants' negligence under the doctrine of *respondeat superior*. The Court, therefore, considers that argument conceded for the purposes of the Motion for Summary Judgment.